IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 8, 2019 Session

## TERRY JOHNSON v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 10-06785          John Wheeler Campbell, Judge

_____

No. W2018-00693-CCA-R3-PC
_____

The petitioner, Terry Johnson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and CAMILLE R. MCMULLEN, J., joined.

Melody M. Dougherty, Memphis, Tennessee, for the appellant, Terry Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith and Andrew C. Coulam, Senior Assistant Attorneys General; Amy P. Weirich, District Attorney General; and Danielle McCollum, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Facts and Procedural History

A Shelby County jury convicted the petitioner of one count of second degree murder, three counts of attempted second degree murder, and one count of possession of a firearm during a dangerous felony, for which he received an effective sentence of twenty-six years in confinement. *State v. Terry Johnson*, No. W2012-01510-CCA-R3-CD, 2014 WL 1291293, at *1 (Tenn. Crim. App. Mar. 31, 2014), *no perm. app. filed*. On direct appeal, the petitioner challenged the sufficiency of the evidence supporting his convictions and the trial court's evidentiary rulings surrounding the petitioner's efforts "to introduce evidence of the deceased victim's involvement in an unrelated murder." *Id.*

This Court summarized the underlying facts leading to the petitioner's convictions, as follows:

The [petitioner's] convictions arose as a result of a shooting following an altercation in the parking lot of a Krystal's restaurant. The [petitioner] was indicted for the first degree murder of Randy Farmer; the attempted second degree murder of Deonte Tucker, Jermaine Mitchell, and Telvin Totes (sic); and possession of a firearm during a dangerous felony. The [petitioner] did not deny that he shot into the victims' car but maintained that he acted in self[-]defense.

The proof at trial revealed that on the evening of July 4, 2010, Jermaine Mitchell, Randy Farmer, Telvin Toles, and Deonte Tucker went to the Level 2 Club. According to Mitchell, the men did not drink alcohol at the club, but some of them smoked marijuana. Mr. Farmer's girlfriend, Richeria Bell, was at another club with Whitney French, Keniece Burks, and Angel Balfour.

At approximately 3:00 a.m., Bell called Mr. Farmer, and they arranged to meet at a Krystal's restaurant on Mt. Moriah. As the women drove toward the restaurant, Alecia Thomason called Burks and said that she was meeting her boyfriend, the [petitioner], at the restaurant.

Bell and her friends were the first to arrive at the restaurant parking lot. Shortly thereafter, the [petitioner] and Xavier Cook arrived in an SUV, and they parked in a dark corner of the parking lot. Subsequently, Mr. Farmer and his friends arrived in a Lincoln. Mr. Farmer, Mitchell, and Toles got out of the car, but Tucker remained inside, talking on his cellular telephone. Mitchell and Toles sat on the trunk while Mr. Farmer went to talk to the women.

Shortly thereafter, another car containing approximately five women and driven by Thomason, came into the parking lot. Mitchell heard the women say "that the driver was going crazy. Saying that she got into it with somebody in the parking lot after the club." The [petitioner] got out of the driver's side of the SUV and approached Thomason's car. The [petitioner] and Thomason argued then began fighting. The [petitioner] pulled Thomason out of the car, choked her hard, stood over her, and "punched" her at least twice with a closed fist while she was lying on her back on the ground.

- 2 -

Mr. Farmer, whom Tucker described as "a small frame guy," grabbed the [petitioner's] shoulder and attempted to break up the fight, but the [petitioner] pushed Mr. Farmer away. Toles and Mitchell ran toward the [petitioner], ready to defend Mr. Farmer. The [petitioner] attempted to hit Mitchell but missed, and Mitchell hit the [petitioner] in the back of the head. Cook got out of the SUV holding a gun. Mitchell, Tucker, and Toles testified that Cook was holding the gun; Bell testified that Cook raised his shirt to display the gun that was tucked into his waistband. Cook stood next to the SUV and threatened, "I will shoot this motherf[* * * *]r up"; however, Cook did not point the gun at anyone. Mitchell, Toles, Tucker, and Mr. Farmer backed away without issuing any threats, and got into the Lincoln. The [petitioner] and Cook quickly returned to the SUV and drove out of the parking lot, making a right turn onto Mt. Moriah. Cook was in the backseat of the SUV, and the [petitioner] was driving.

After the SUV left, Tucker drove out of the parking lot and turned right, intending to go to Mr. Farmer's house. On Mt. Moriah, the Lincoln was in the middle lane, and the SUV was proceeding at approximately "two miles per hour" in the far right lane. When Tucker began to pass the SUV, the [petitioner] stopped the SUV, jumped out, ran toward the Lincoln, and fired at least ten shots at the passenger side of the car. The [petitioner's] pistol appeared to be either a .40 or .45 caliber and appeared to be the same gun Cook was holding in the parking lot. The Lincoln's windows and doors were damaged during the shooting.

. . .

Mr. Farmer died from his gunshot wounds. The victims had not met the [petitioner] or Cook before the shooting. None of the men in the Lincoln had a weapon that evening.

. . .

On July 7, 2010, Officer David Payment processed the Lincoln and found some "ricochet glancing damage" and eight bullet holes. Inside the car, he found a cellular telephone and an MP3 player but did not find any weapons. Officer Payment also processed the SUV and found no bullet damage.

. . .

- 3 -

The twenty-three-year-old [petitioner] testified that in the early morning hours of July 5, 2010, he was with Cook. While they were driving around, he called Thomason. She told him that she was going to Krystal's, and he went to meet her there.

The [petitioner] said that when he arrived, Burks came over and spoke with him. He told her that he was going to see what was wrong with Thomason. The [petitioner] noticed that two men were around a Lincoln and that Bell and [Mr. Farmer] were talking. After speaking with Burks, the [petitioner] walked over to Thomason's car. He detected that she had been drinking, knew that she had been driving, and asked "why she [was] drinking with passengers in the car." Thomason opened her car door and, as she got out, stumbled and fell. Thomason and the [petitioner] began to argue because the [petitioner] "didn't understand why she's drinking and she wouldn't tell [him] what happened at the club." The [petitioner] said that he was trying to discern if Thomason was okay or if she needed medical assistance. The [petitioner] got mad at Thomason, put his hands on her, and began struggling with her.

The [petitioner] said that after Thomason fell, he stood over her and told her that she did not need to be driving while intoxicated. She would not talk to him, and he grabbed around her collarbone to get her up. Thomason told him to get away, and he backed up. The [petitioner] heard someone tell him not to hit Thomason. The [petitioner] responded, "I'm not fixing to hit. I'm just trying to see what's going on." He explained, "I'm trying to get away from everybody else so she wouldn't be showing out and so we can talk one-on-one." The [petitioner] acknowledged that he was feeling agitated.

The [petitioner] stated that when Thomason stood up, "she still was acting crazy," and they moved toward the front of her car. The [petitioner] pushed her onto the car to try to take her keys and prevent her from leaving. Warren then yelled at the [petitioner], trying to get him away from Thomason. At that point, someone hit the [petitioner] in the back of the head. The [petitioner] said that the punch left him dazed and hurting. The [petitioner] did not know who hit him or why he was hit. The [petitioner] looked around and saw Cook pull out his gun. [Mr. Farmer] and his friends responded by "jumping up and down, like, rowdy, [as if] they wanted to do some more things." The men said, "You pistol playing."

- 4 -

The [petitioner] said he became nervous because he did not know whether Cook intended to shoot. Cook said, "[H]e don't know me like that. I'll shoot." The other men told Cook to put up his gun and said "you got 30 seconds to get off the lot." The [petitioner] said that Mitchell had a gun in his hand and that the [petitioner] feared the men would try to kill him. The [petitioner] said that things were happening so quickly he did not know how to react and did not know "what was fixing to go down;" however, he knew that Cook's displaying his gun had angered [Mr. Farmer's] group. The [petitioner] told everyone to get in their cars because he was in the open and had no way of defending himself. He also believed that innocent bystanders could be injured if gunfire erupted.

The [petitioner] said that he and Cook got into the [petitioner's] SUV. The [petitioner] backed out of his parking space, looked at [Mr. Farmer's] group, and heard them say to follow the [petitioner]. When the [petitioner] drove away, [Mr. Farmer's] group quickly followed. [Mr. Farmer's] group managed to block the parking lot's exit, forcing the [petitioner] to make a right turn. The [petitioner] sped away, and the men pursued. The [petitioner] said that he saw the Lincoln quickly approaching, as if to ram the SUV. The [petitioner] heard a gunshot and saw Cook duck. The [petitioner] said that he did not want the men to follow him home. He also stated that he thought that the men might be after him or Cook and that he needed to defend himself. The [petitioner] grabbed Cook's gun from the console, got out of the car, and started shooting at the Lincoln without aiming at anyone. The [petitioner] said, "I ain't know that nobody was going to get killed. I just wanted to protect me." The [petitioner] stated that he feared the men because

> I heard a [shot]. I mean, where else would a shot come from but I saw him with a gun on the lot. And I knew of Randy Farmer involved in a murder. So I don't know. I ain't know what else to expect.

The [petitioner] said that he had gone to high school with [Mr. Farmer's] "baby mother" and that he knew of [Mr. Farmer]. When the [petitioner] saw [Mr. Farmer] in the parking lot that night, he was "shocked and surprised because I knew he was involved in a murder." The [petitioner] stated that he did not remember [Mr. Farmer] getting involved in the altercation the [petitioner] had with Thomason.

- 5 -

The [petitioner] said that he got in the SUV and drove away after the shooting. He was frightened for his life and panicked. The [petitioner] maintained that he initially tried to avoid the situation then felt like he had to defend himself and Cook. He said that he was not trying to kill anyone and that he "was trying to just get them off of me really. Just like warning shots. I was trying to shoot the tires." The [petitioner] said that he regretted the incident and wanted the victims and their families to forgive him.

On cross-examination, the [petitioner] said that he did not know that Cook had a gun that night until he displayed it to [Mr. Farmer] and his friends. The [petitioner] said that he did not choke Thomason but that he grasped her shoulders and tried to get her keys so that she would not drive intoxicated. He said, "We were arguing about nothing really." After Thomason stood, the [petitioner] pushed her against the car to try to get her attention. Warren and Burks tried to intervene, but none of the men did.

The [petitioner] acknowledged that he thought Mitchell hit him with the gun but that he had not seen the strike and could not be sure who or what hit him. Mitchell told everyone to get off the parking lot in thirty seconds. The [petitioner] conceded that although he was concerned about Thomason's driving while intoxicated, he did not offer to drive her and her friends away from the parking lot. The [petitioner] denied stopping on Mt. Moriah, insisting that he jumped from his moving SUV. The [petitioner] asserted that he did not aim at "anybody. I just aimed at the direction [be]cause I wasn't looking at first." At the time, he did not realize that he fired multiple shots that hit the Lincoln and injured three of the passengers. The Lincoln drove past the [petitioner], but he did not see any broken glass or damage to the vehicle. He "thought they was just going to get away from me [be]cause I saw them kept going." The [petitioner] acknowledged that he shot at the Lincoln once after it drove past him. He explained that he aimed for the tires so the car would not be able to follow him home. The [petitioner] stated that he knew a police station was on Mt. Moriah about fifty yards away from the scene of the shooting and that he did not think of calling 911 for assistance. After the shooting, the [petitioner] did not go to the police station and instead drove Cook home. When Balfour called the [petitioner] later that morning to ask what happened, the [petitioner] told her that he shot the men because they were following him. On July 7, shortly before he turned himself in to the police, the [petitioner] saw Thomason at Warren's house.

- 6 -

After the [petitioner] testified, the defense rested. In rebuttal, Xavier Cook testified that he was with the [petitioner] in the early morning hours of July 5, 2010. Around 1:00 or 2:00 a.m., the [petitioner] learned of the incident Thomason had at a club and asked Cook to get his gun. They went to Cook's house, Cook got his mother's gun, and he gave the gun to the [petitioner]. Thereafter, they went to Krystal's to wait for Thomason. When they arrived, Cook told the [petitioner] to leave the gun in the truck. Cook sat in the truck, and the [petitioner] got out of the vehicle. Cook did not say when he put the gun in the waistband of his pants.

Cook said that when Thomason arrived at the parking lot, the [petitioner] asked her what had occurred. Thomason and the [petitioner] started "arguing and tussling." The [petitioner] asked Thomason "where the n[* * * *]rs was at." While the [petitioner] was "tussling" with Thomason, four men Cook did not know tried to surround the [petitioner]. Cook pulled the gun from the waistband of his pants and said, "[N]aw, it's not going to go down like that. Y'all ain't fixing to jump on him or nothing." Cook said that he did not point the gun at anyone but kept the gun in his hand at his side. Cook told the [petitioner] that they should leave, and they got into the [petitioner's] SUV. Cook put the gun on the console. Cook heard one of the four men say, "[G]o bring the strap up here, such and such and such. Man, he pistol playing us and all this and that." The four men got into their car, and Cook heard them say, "We fixing to follow these n [* * * *]rs." Although the four men backed out of their parking space first, they waited for the [petitioner] to back up and followed as he made a right turn out of the parking lot. The [petitioner] grabbed the gun from the console, jumped out of the SUV, and "[u]nloaded" the gun, shooting ten or eleven times at the Lincoln. After the shooting, the [petitioner] got back into the SUV and returned the gun to Cook. The [petitioner] took Cook home then left.

Cook said that he did not see anyone else in the parking lot with a gun. When the four men approached the [petitioner], they hit their fists together and acted "like they was fixing to jump on him." Cook heard no gunshots other than the ones fired by the [petitioner]. Cook saw the [petitioner] the day after the shooting, and the [petitioner] asked what Cook intended to tell the police. Cook acknowledged that he had been charged for his role in the offense but maintained that he had not been promised anything for his testimony.

On cross-examination, Cook admitted that he hoped "to get a better deal for testifying." He said that all four men acted as if they wanted to fight the [petitioner] but that none of them had a gun. Cook did not see any of the men hit the [petitioner] in the head. Cook said that he pulled out his gun because he felt threatened when the men surrounded the [petitioner].

Cook stated that Mr. Farmer spoke with someone by telephone and told them to bring a gun. Cook said that the men intended to follow Cook and the [petitioner] until the men got their guns. Cook thought that his and the [petitioner's] lives were threatened.

*Terry Johnson*, 2014 WL 1291293, at \*1-6 (internal footnote omitted). Upon our review, this Court upheld the petitioner's convictions and the rulings of the trial court.

The petitioner filed a timely, amended petition for post-conviction relief on March 30, 2015.[1] In the amended petition, the petitioner again challenged the sufficiency of the evidence supporting his convictions and alleged he received ineffective assistance of counsel at trial. The petitioner argued trial counsel failed to "cross-examine Telvin Toles regarding his pending charges in a first degree murder case, which also involved Randy Farmer" and "failed to request that the jury instructions include defense of a third person."

At the post-conviction hearing, trial counsel explained after reviewing discovery and hiring a private investigator, he pursued a theory of self-defense in representing the petitioner. He discussed the self-defense strategy with the petitioner and his family prior to trial. Regarding his defense strategy, trial counsel remembered "battling every step of the way with respect to our primary defense of self-defense" with the trial court. As such, he chose to focus on the theory of self-defense, rather than defense of another, and accordingly, did not request a jury instruction on defense of another. Trial counsel reasoned, if the trial court "was not going to let me get the argument out of self-defense for [the petitioner] [the trial court] wasn't going to let me raise it as to the third party." Trial counsel further described the hurdles he faced during trial, as follows:

But I would say, again, actually after reviewing the record and everything I'm very disappointed in the rulings throughout with respect to my ability to cross[-]examine, try to impeach and raise the issue of what was [the petitioner's] state of mind. I felt like I was foreclosed almost at every opportunity. I would say also that I feel like there was sufficient

---

[1]The original petition is not included in the record on appeal.

evidence raised repeatedly that should allow me to have gotten into much more and I just wasn't able to do that.

Trial counsel also respectfully disagreed with this Court's opinion on direct appeal wherein this Court determined the trial court did not abuse its discretion in limiting evidence detailing Mr. Farmer's involvement in a separate murder.

Similarly, trial counsel felt limited in his ability to cross-examine the State's witness, Telvin Toles. Trial counsel explained the trial court allowed him to impeach Mr. Toles regarding his involvement in a conspiracy to commit murder with Mr. Farmer. However, the trial court only allowed the introduction of Mr. Toles' conviction, not any of the facts surrounding the same. Trial counsel further noted he cross-examined Mr. Toles regarding a statement Mr. Toles gave to police after the shooting, though trial counsel did not directly present Mr. Toles with the statement at trial. When asked why he did not confront Mr. Toles with his prior statement, trial counsel explained:

There may have been a strategic reason maybe he wasn't answering how I wanted him to, you know, maybe I felt like he wasn't going to. Sometimes -- sometimes it looks worse in front of a jury if you ask a question and not get the answer then maybe you shouldn't ask the question at all. That could have been a trial strategy decision at that time, I don't know.

The petitioner entered Mr. Toles' statement into evidence along with a supplemental statement from Sergeant Tony Mullins. In the statements, Mr. Toles noted Mr. Farmer called someone before leaving the Krystal's parking lot. Additionally, the statements reflect that Mr. Toles heard Mr. Farmer make statements to the petitioner prior to the shooting, including "I hope y'all going to be here" and "we going to show you what's up." Trial counsel acknowledged he did not question Mr. Toles regarding the statements Mr. Toles heard Mr. Farmer make, noting, however, his failure to do so was "certainly not the gravamen of the case." Rather, trial counsel believed the case turned on the limitations imposed by the trial court regarding his ability to introduce evidence of the victims' previous involvement "in a murder" and their "indicat[ion] that there was a fight to be had that night." Trial counsel explained his defense theory rested on the petitioner's state of mind at the time he interacted with the victims, noting, "it's not just a statement. It's not just a cross[-]exam, that's our -- that's our case." Trial counsel "pushed as hard as [he] could" against the trial court's evidentiary rulings and he "represented [the petitioner] as vigorously and zealously as [he] could." Regardless, trial counsel stated the jury likely did not find the petitioner's actions in shooting the victims to be reasonable.

The petitioner then testified, stating he and trial counsel reviewed the discovery and discussed self-defense as the defense theory prior to trial but did not discuss defense of another as a possible defense. The petitioner noted Mr. Cook testified at trial that he feared for his life at the time of the shooting, yet trial counsel did not request a jury instruction on defense of another. The petitioner also generally stated trial counsel was not prepared for trial. In support, the petitioner suggested trial counsel should have reviewed the crime scene, introduced video footage from the Krystal's parking lot, and interviewed Mr. Cook's godbrother, Mr. Farmer's girlfriend, and the Krystal's employees who called 9-1-1. The petitioner concluded his testimony stating, "I believe [trial counsel's] attitude was positive, we just didn't have enough time to fully prepare, you know."

After its review of the evidence presented, the post-conviction court denied the petition, finding the petitioner failed to carry his burden of proof to show the ineffective assistance of trial counsel. The petitioner timely appealed.

*Analysis*

On appeal, the petitioner asserts the outcome of his trial would have been different absent the deficiencies of trial counsel. The petitioner argues trial counsel failed to pursue an additional defense theory of defense of another, failed to request a jury instruction on the same, and failed to properly cross-examine and impeach Telvin Toles. The petitioner argues the cumulative effect of trial counsel's failures warrants a new trial. The State contends the petitioner received effective assistance of counsel in pursuing a theory of self-defense, rather than defense of another, as "the facts weighed so heavily against a finding that the petitioner's emptying a weapon on an unarmed group of men was reasonable, even knowing that he was aware that one of the victims was involved in a murder." The State also maintains trial counsel effectively cross-examined Mr. Toles and no cumulative error exists. Following our review of the record and the submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the

petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

I.    Defense Strategy

- 11 -

The petitioner challenges trial counsel's defense strategy, which rested solely on a theory of self-defense. The petitioner argues "[p]resenting a defense of a third person theory and having the jury instructed on the same would have corroborated the self-defense theory." The State contends trial counsel made a strategic decision not to pursue defense of another at trial, and we agree.

At the post-conviction hearing, trial counsel and the petitioner testified trial counsel prepared for the petitioner's case by reviewing the State's discovery file and hiring a private investigator. After doing so, trial counsel and the petitioner discussed pursuing a theory of self-defense. Trial counsel also discussed the defense strategy with the petitioner's family. Trial counsel testified he felt hindered by the trial court's evidentiary rulings in presenting the self-defense theory. Specifically, trial counsel was limited in detailing Mr. Farmer and Mr. Toles' involvement in an unrelated murder to show the petitioner feared the victims prior to the shooting. As a result, trial counsel made a strategic decision not to pursue the additional theory of defense of another despite testimony from both the petitioner and Mr. Cook that they feared the victims at the time of the shooting. As noted by the post-conviction court and this Court on direct appeal, the jury clearly accredited the testimony of the State's witnesses over that of the petitioner:

> The State's witnesses testified that the [petitioner] assaulted Thomason, prompting Mr. Farmer, Toles, Tucker, and Mitchell, who were unarmed, to intervene. Thereafter, Cook threatened the victims with a gun. As the victims were leaving the area, the [petitioner] jumped out of his vehicle and fired multiple rounds at the victims' vehicle, injuring two of the men and killing a third. It is well-established that determining the credibility of witnesses is within the purview of the jury. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). In the instant case, the jury clearly resolved the issue of credibility in the State's favor.

*Terry Johnson*, 2014 WL 1291293, at *9.

The record shows trial counsel made a strategic decision to pursue self-defense, rather than self-defense and defense of another, after thorough preparation and discussions with the petitioner. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (citing *Goad*, 938 S.W.2d at 369). In denying relief on this issue, the post-conviction court accredited the testimony of trial counsel and found "he was prepared to try the petitioner's case and made a strategic decision on what defense to pursue." Again, we agree. The petitioner has failed to demonstrate trial counsel's defense strategy was unreasonable, fell below professional norms, or that it prejudiced the outcome of his case.

- 12 -

*Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 687, 688; *Baxter*, 523 S.W.2d at 936). Rather, the record indicates trial counsel zealously pursued self-defense at trial, a theory which was rejected by the jury. The petitioner is not entitled to relief.

Similarly, the petitioner is not entitled to relief as to his correlating claim that trial counsel was ineffective for not requesting a jury instruction on defense of another. As explained above, trial counsel made a reasonable and strategic decision in focusing on the theory of self-defense. Because trial counsel did not pursue defense of another, a jury instruction on the same was not necessary. Nothing in the record suggests the outcome of the petitioner's trial would have been different had trial counsel pursued defense of another and the petitioner is not entitled to relief as to trial counsel's failure to request a jury instruction on the same. This issue is without merit.

II.     Cross-examination of Telvin Toles

The petitioner argues trial counsel was ineffective in his handling of Mr. Toles' testimony at trial. The petitioner asserts trial counsel failed to confront Mr. Toles with his prior statement during cross-examination and in turn, failed to adequately highlight the petitioner's fear of the victims prior to the shooting. The petitioner claims trial counsel's failures left the jury "without viable information needed for their determination of whether [the petitioner] was acting justifiably." The State contends "the statement was not critical to impeachment, nor was counsel's failure to inquire about this statement prejudicial to the petitioner." We agree with the State.

The petitioner suggests the outcome of his case would have been different had the jury known prior to the shooting Mr. Farmer threatened the petitioner and Mr. Cook and suggested a fight would ensue.[2] The post-conviction court disagreed, stating:

> [Trial counsel] testified that he did not feel that it was tactically advantageous to pursue that line of questioning and decided not to confront [Mr. Toles] with the prior statements. [Trial counsel] testified that in looking at the proof in hindsight he could see why the jury could have rejected the defense's argument.
>
> > Q: And do you believe that using the --Mr. Toles' statement and Sergeant Mullins' supplement didn't impeach Mr. Toles' testimony or Mr. Toles in general would have been beneficial to this case.

---

[2] In his reply brief, the petitioner also suggests trial counsel failed to cross-examine Mr. Toles on: "Mr. Toles admitting that the [victims] were following [the petitioner] and Mr. Cook, and that the Lincoln carrying the [victims] stopped their vehicle behind the Yukon."

A: I can't say that it wouldn't but that's certainly not the gravamen of the case. It didn't swing or fail by me not impeaching or asking Toles did you say this specifically. I think -- I don't know. In my opinion, and I don't know, you can't get in the minds of a jury but as I recall the [petitioner] and Mr. Cook left the parking lot first, they were gone, that the vehicle sped by them and that was clear at a high rate of speed. There was some testimony that maybe a shot was fired, maybe not, that was in dispute, but that vehicle was going. So I mean, I think if I were to try to be -- looking in hindsight I would -- I would think that perhaps the jury thought that it ended there. The vehicle could just have been allowed to proceed. Perhaps Mr. Johnson could have gone another direction or stayed stopped, rather instead he exited and he unloaded his weapon. So I think that's where -- that's why I feel like the case went down is what they felt like his actions were reasonable or not.

A review of this case supports [trial counsel's] opinion, the petitioner chose to shoot multiple shots into a moving car, killing the victim, after [] any real danger to him had passed.

Upon our review of the issue, we agree with the post-conviction court. At the evidentiary hearing, trial counsel suggested he made a strategic decision not to confront Mr. Toles with his statement during cross-examination. Trial counsel explained he felt "foreclosed" by the trial court throughout the trial and the rulings of the trial court affected his ability to question witnesses and present a defense. Despite the hurdles trial counsel faced, trial counsel impeached Mr. Toles by questioning about his conviction for conspiracy to commit murder. Trial counsel also questioned Mr. Toles about his police statement though he did not confront him with it specifically.

Additionally, the record indicates the jury heard evidence of the victims' interactions with the petitioner and Mr. Cook prior to the shooting as noted by this Court on direct appeal:

In the light most favorable to the State, the proof adduced at trial revealed that Mr. Farmer, Tucker, Toles, and Mitchell went to Krystal's after being at a club. While in the parking lot, the men witnessed the [petitioner] and Thomason argue, then the [petitioner] pulled Thomason from her car, put her on the ground, stood over her, and began choking her

- 14 -

and hitting her. Mr. Farmer attempted to stop the altercation. An altercation ensued, during which the [petitioner] was struck on the head. In response, Cook displayed his gun and threatened to shoot. Mr. Farmer, Tucker, Toles, and Mitchell did not want to "gun play" and left the parking lot, turning right behind the [petitioner]. As they were driving away, they saw the [petitioner's] SUV driving very slowly. The [petitioner] jumped out of the SUV, ran toward the Lincoln, and fired at least eleven shots at the car. At least eight of the shots hit the car. Mitchell, Tucker, and Mr. Farmer were struck by the bullets. Mr. Farmer died from his injuries. After the incident, the [petitioner] drove away from the area.

*Terry Johnson*, 2014 WL 1291293, at *8. Though the petitioner argues a deeper cross-examination of Mr. Toles about the statement he made to police would have changed the outcome of his trial, we are not persuaded. Nothing in the record demonstrates trial counsel's strategy regarding Mr. Toles' testimony was not sound, and the petitioner has failed to show that trial counsel's strategy regarding Mr. Toles' testimony amounted to deficient performance. *Strickland*, 466 U.S. at 689; *see* Tenn. Code Ann. § 40-30-110 (f); *Goad*, 938 S.W.2d at 369. The petitioner is not entitled to relief.

III. Cumulative Error

Finally, the petitioner contends the cumulative effect of the alleged errors at trial entitled him to a new trial. Pursuant to the cumulative error doctrine, "there may be multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings that is so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Here, we discern cumulative error by the trial court does not exist. As such, the petitioner is not entitled to relief.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE